**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

```
------------------------------ x
T.M and J.M. Guardians, on        :
Behalf of C.M.,                   :
                                  :
          Plaintiffs,             :
                                  :
v.                                :
                                  :   Civil No. 3:24-cv-1380(AWT)
                                  :
WESTON BOARD OF EDUCATION,        :
                                  :
          Defendant.              :
                                  :
------------------------------ x
```

**RULING ON PENDING MOTIONS**

Plaintiffs T.M. and J.M., as parents and guardians of C.M., have moved for injunctive relief pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400 et seq. The plaintiffs have filed a two-count Amended Complaint (ECF No. 41) ("Am. Compl."). In Count One, the plaintiffs seek relief pursuant to 20 U.S.C. § 1415(j), the IDEA's stay-put provision. In Count Two, the plaintiffs seek relief pursuant to 20 U.S.C. § 1415(i), which the plaintiffs claim vests the court with equitable authority to change C.M.'s placement in extraordinary circumstances, regardless of whether the plaintiffs have exhausted their administrative remedies. Defendant Weston Board of Education (the "Board") has moved to

-1-

dismiss the Amended Complaint, and also disputes the plaintiffs' position with respect to which program C.M. is entitled to attend at public expense during the pendency of administrative proceedings.

For the reasons set forth below, the plaintiffs' motion for injunctive relief is being denied with respect to Count One, and the defendant's motion to dismiss is being granted with respect to Count Two.

## I.   FACTUAL BACKGROUND

C.M. is diagnosed with autism spectrum disorder, obsessive compulsive disorder, and other conditions. He was first identified as eligible for special education at the age of two. Since then, he has received special educational and therapeutic services in a variety of settings, based on the recommendations of his Planning and Placement Team ("PPT"). The PPT is a group of school administrators, educators, and therapists who meet regularly, along with C.M.'s parents, to develop and update C.M.'s individualized education plan ("IEP").

Until the eighth grade, C.M. received special education and related services in Weston public schools. In early 2020, C.M.'s PPT recommended that C.M. be transferred from Weston Middle School to the Anderson Center for Autism ("Anderson"), a residential program located in New York state, due to his

behavioral difficulties in a general educational setting. C.M.'s parents agreed.

In May 2021, after another student was alleged to have harmed C.M., C.M.'s PPT and C.M.'s parents made a joint decision to remove C.M. from Anderson during the pendency of a school and law enforcement investigation into that traumatic incident. C.M. then received virtual services from Anderson, as well as in-home support from behaviorists who were independently retained by C.M.'s parents. The Board paid Anderson for C.M.'s tuition directly. It also agreed to reimburse C.M.'s parents for C.M.'s sessions with the behaviorists, even though the behaviorists were not certified special education teachers, in order to support C.M. during this period.

As the 2021-2022 school year began, C.M. was re-enrolled in Anderson, which had remained the designated placement specified in his IEP. See Pl. Ex. 4 at 1 (June 2021 IEP). In July 2022, C.M.'s parents and his PPT made a collective decision to remove C.M. indefinitely from Anderson after finding further evidence of trauma, which was reported by the school district to New York state authorities. C.M.'s PPT agreed with C.M.'s parents that it would be necessary to find another placement for C.M. See Def. Ex. 4. at 1 (July 2022 IEP).

C.M.'s PPT began investigating the feasibility of enrolling C.M. in a private therapeutic day school. The PPT did so to

accommodate his parents' wishes to avoid the potential risk of retraumatization and dysregulation that could result from enrolling C.M. in another residential program. In September 2022, the PPT recommended that C.M. attend a private, state-approved day school, the Aspire Living and Learning School ("Aspire").

C.M.'s enrollment in Aspire actually began on November 2, 2022, when Aspire had capacity to accommodate him as a student. Before and after that date, the behaviorists providing C.M. with at-home support worked closely with Aspire's team to prepare C.M. for the transition.

Despite the efforts of those supporting him, C.M. did not achieve meaningful attendance at Aspire. Specifically, C.M. became highly dysregulated both in transit to Aspire and once he was on campus. As a result, C.M. spent on average approximately 12.5 minutes on campus each day, and the Aspire staff was unable to evaluate C.M.'s educational progress with respect to his IEP. It relied instead on previous reports by Anderson's staff.

On June 6, 2023, C.M.'s PPT met. The PPT recommended that C.M.'s IEP be implemented in a residential placement. C.M.'s parents disagreed with C.M. attending a residential school, so the PPT considered alternative day schools. However, at that time, no day placement other than Aspire was available.

Following mediation to resolve the disagreement during the June PPT meeting, C.M.'s parents and the Board executed a settlement agreement on July 3, 2023. The Board agreed to pay $63,042 to C.M.'s parents to settle the parents' claims against the Board for the period from June 19, 2023 to August 31, 2023. The agreement referenced the fact that the parties disagreed about what constituted an appropriate placement for C.M., and also referenced the Board's position that it had no responsibility to pay for the home-based educational program designed by C.M.'s parents. The parties agreed that C.M.'s parents were "unilaterally" enrolling him in the home-based program, and that the home-based program "shall not constitute 'stay put' under federal or state law." Def. Ex. 2 at 3 (¶ 2).

On August 2, 2023, the PPT met to develop C.M.'s placement for the coming school year. Following that meeting, C.M.'s parents filed a request for mediation with the Connecticut State Department of Education (the "CSDE") on August 7, 2023 to resolve the question of what constituted an appropriate placement for C.M. for the coming school year. On October 3, 2023, C.M.'s parents, school administrators, an attorney for the Board, and an advocate for the parents participated in a mediation facilitated by a CSDE mediator. That mediation resulted in a second settlement agreement, which was executed on November 15, 2023.

The November 2023 settlement agreement provided that the Board would pay $237,500 to C.M.'s parents to settle all claims arising through August 31, 2024. Like the July 2023 settlement agreement, the November 2023 agreement referenced the fact that the parties disagreed about what constituted an appropriate placement for C.M. and the fact that C.M.'s parents were "unilaterally" enrolling C.M. in the same home-based program; it stated that the home-based program "shall not constitute 'stay put' under federal or state law." Def. Ex. 1 at 3 (¶ 2). In the November 2023 settlement agreement, as they had in the July 2023 settlement agreement, C.M.'s parents acknowledged that they had the opportunity to consult with counsel and that they read and understood every provision of the agreement. The Amended Complaint alleges that the November 2023 settlement agreement is "a unilateral placement agreement." Am. Compl. ¶ 37.

During the periods covered by the settlement agreements, C.M. was enrolled in the home-based program developed by his parents. In this program, C.M. has been receiving care primarily from two behaviorists with whom he has become familiar, Lauren Malinowski and Ronnie DePompeis. C.M. has also been receiving additional services, such as speech therapy, occupational therapy, and physical therapy, at appointments with other providers.

On May 21, 2024, the PPT met for an annual review of C.M.'s
IEP and placement and to plan for the 2024-2025 school year. At
that meeting, the PPT recommended placement at Hubbard Day
School ("Hubbard"), a state-approved therapeutic day program
comparable to Aspire. The PPT formulated a specific transition
plan, which would begin in June, so it would give C.M. time to
begin acclimating to the new program before the 2024-2025 school
year began. The transition plan included special arrangements
under which Hubbard staff would join C.M.'s home-based program
and pair with C.M.'s current behaviorists, Ms. Malinowski and
Mr. DePompeis, to provide services to C.M. Hubbard's director
discussed the possibility of permanently hiring the behaviorists
with whom C.M. was comfortable, should that become necessary.
Under this plan, C.M. would increase his attendance at Hubbard
over time, as his providers introduced slow, gradual changes to
his environment. C.M.'s parents objected to the recommendation.

On August 23, 2024, C.M.'s parents filed a request for a
due process hearing with the CSDE, claiming that the Board had
violated the IDEA by failing to provide C.M. with an adequate
placement. In that proceeding, C.M.'s parents seek: (1) a
determination that the PPT's placement unlawfully denies C.M. a
free appropriate public education; (2) an order that C.M's IEP
and placement for the 2024-2025 school year be designated as the
home-based program developed by his parents; (3) an order

requiring the Board to continue funding C.M.'s home-based program during the pendency of the proceedings; and (4) attorneys fees.

Five days later, C.M.'s parents commenced this action seeking to enforce the stay put provision of the IDEA and moved for a temporary restraining order and a preliminary injunction. A temporary restraining order was issued on August 30, 2024. On September 25, 2024, the plaintiffs amended their complaint by adding Count Two. On October 2, 2023, the court held an evidentiary hearing.

## II.  STATUTORY FRAMEWORK

The IDEA "authorizes the disbursement of federal funds" to states that enact plans to provide all children with disabilities, who reside in the state and are between the ages of 3 and 21, with a free and appropriate public education ("FAPE"). Ventura de Paulino v. N.Y.C. Dep't of Educ., 959 F.3d 519, 525 (2d Cir. 2020). See 20 U.S.C. § 1412(a)(1)(A). "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012)(citing 20 U.S.C. § 1414(d)). IEPs must specify "'the educational needs of [the] handicapped child and the specially designed instruction and related services to be employed to meet those needs.'" Doe v. E. Lyme Bd. of Educ., 790

F.3d 440, 448 (2d Cir. 2015) (quoting Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 368 (1985)).

"If a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006). However, "[p]rivate placement is reimbursable only if 'such placement, rather than a proposed IEP, is proper under the Act.'" Doe, 790 F.3d at 448 (quoting Burlington, 471 U.S. at 369). See 20 U.S.C. §§ 1412(a)(10)(C)(i)-(iii).

The IDEA requires states to implement a system of administrative review so that those who wish to adjudicate their rights and obligations under the IDEA, or to challenge the adequacy of an IEP or placement, may be heard in "an impartial due process hearing" and thereafter appeal the decision to a state agency providing "impartial review." 20 U.S.C. §§ 1415(f)-(g). Parties aggrieved by final agency decisions may seek judicial review in federal district court, but only after exhausting their administrative remedies. See 20 U.S.C. § 1415(i)(2)(A); M.H. v. New York City Dep't of Educ., 685 F.3d 217, 240 (2d Cir. 2012) (reviewing courts should, with respect to the IDEA, "give due weight to [administrative] proceedings,

mindful that the judiciary generally lacks the specialized
knowledge and experience necessary to resolve persistent and
difficult questions of educational policy" (citations and
internal quotation marks omitted)).

The stay-put provision allows parties to seek immediate
relief in courts of competent jurisdiction without exhausting
administrative remedies. See Murphy v. Arlington Cent. Sch.
Dist. Bd. of Educ., 297 F.3d 195, 199 (2d Cir. 2002) ("an action
alleging violation of the stay-put provision falls within one,
if not more, of the enumerated exceptions to [the IDEA's
exhaustion requirement]"). In relevant part, the stay-put
provision provides that

> during the pendency of any proceedings conducted pursuant
> to [20 U.S.C. § 1415], unless the State or local
> educational agency and the parents otherwise agree, the
> child shall remain in the then-current educational
> placement of the child, . . . .

20 U.S.C. § 1415(j).

The provision aims "to maintain the educational status quo
while the parties' dispute is being resolved," T.M. ex rel. A.M.
v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 152 (2d Cir. 2014),
and to prevent a "school district from unilaterally modifying a
student's educational program during the pendency of an IEP
dispute." de Paulino, 959 F.3d at 534. "[W]here the IDEA's stay-
put provision is implicated, the provision triggers the
applicability of an automatic injunction designed to maintain

the child's educational status quo while the parties' IEP dispute is being resolved." de Paulino, 959 F.3d at 529. "The administrative process is 'inadequate' to remedy violations of § 1415(j) . . . given [its] time-sensitive nature." Murphy, 297 F.3d at 199 (citation omitted). Thus, the statute renders inapposite "the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982).

The stay-put provision requires school officials to "continue funding whatever educational placement was last agreed upon for the child until the relevant administrative and judicial proceedings are complete." T.M., 752 F.3d at 171. See also Zvi D., 694 F.2d at 906 ("[I]mplicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing").

Parents or guardians who believe a child's pendency placement is inadequate under the IDEA are always free to "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials." Burlington, 471 U.S. at 373. But parents "do so at their own financial risk." Id. at 373. If the unilateral

placement chosen by the parents, "rather than a proposed IEP,"
is ultimately found to be "proper under the Act," the parents
can receive reimbursement. See id. at 369-370 (discussing 20
U.S.C. § 1415(e)(2)). Alternatively, if an agency or "the courts
ultimately determine that the IEP proposed by the school
officials was appropriate, the parents would be barred from
obtaining reimbursement . . . ." Id. at 374.

### III. DISCUSSION

As to Count One, the court concludes that the factual
allegations in the Amended Complaint are sufficient to survive
the defendant's motion to dismiss, but the plaintiffs' motion
for injunctive relief should be denied. As to Count Two, the
court concludes that the motion to dismiss should be granted.

### A. Count One: Section 1415(j)

C.M.'s parents claim that they are entitled, under the
IDEA's stay-put provision, to an order requiring the Board to
continue financing C.M.'s home-based program during the pendency
of the due process proceedings before the CSDE. They contend
that the home-based program constitutes C.M.'s then-current
educational placement for purposes of the stay-put provision.
Taking as true the factual allegations in the Amended Complaint
and construing them in the light most favorable to the
plaintiffs, see Pettaway v. Nat'l Recovery Sols., LLC, 955 F.3d

299, 304 (2d Cir. 2020), Count One survives the motion to
dismiss.

In <u>Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington
Cent. Sch. Dist.</u>, 386 F.3d 158 (2d Cir. 2004), the Second
Circuit addressed for the first time the meaning of the term
"then-current educational placement." The court stated:

> Although the IDEA does not define, and our Circuit has
> not previously considered the meaning of, the term "then-
> current educational placement," our sister circuits have
> interpreted the term to mean: (1) "typically the placement
> described in the child's most recently implemented IEP,"
> <u>Johnson v. Special Educ. Hearing Office</u>, 287 F.3d 1176,
> 1180 (9th Cir. 2002); (2) "the operative placement actually
> functioning at the time ... when the stay put provision of
> the IDEA was invoked," <u>Drinker v. Colonial Sch. Dist.</u>, 78
> F.3d 859, 867 (3d Cir. 1996); and (3) "[the placement at
> the time of] the previously implemented IEP," <u>Thomas v.
> Cincinnati Bd. of Educ.</u>, 918 F.2d 618, 625 (6th Cir. 1990).

<u>Mackey</u>, 386 F.3d at 163.

In <u>Johnson</u>, the court explained that "[f]or the purpose of
§ 1415(j)'s 'stay put' provision, the current educational
placement is typically the placement described in the child's
most recently implemented IEP." 287 F.3d at 1180 (citing <u>Thomas</u>,
918 F.2d at 625). There, the dispute arose while the child was
turning three and transitioning between an Individualized Family
Service Plan ("IFSP") implemented for him by one agency, the
Central Valley Regional Center, and an IEP, which Clovis Unified
School District was required by law to develop and implement for
him moving forward. The court held that the child's IFSP

supplied his then-current educational placement, but that such a placement need not involve the exact same providers and could be implemented by Clovis, the agency responsible for the education of children three years and older. See id. at 1181.

In Drinker, the court stated that "the dispositive factor in deciding a child's 'current educational placement' should be the Individualized Education Program ('IEP') . . . actually functioning when the 'stay put' is invoked." 78 F.3d at 867. The court cited Thomas for the proposition that the "then-current educational placement" should be the "operative placement actually functioning at the time the dispute first arises." Drinker, 78 F.3d at 867 (quoting Thomas, 918 F.2d at 625-626). The court found that the student's current placement at Gladwyne Elementary, on which the parents and school district previously agreed, constituted the student's pendency placement notwithstanding the school district's attempt to transfer the child to Colonial, another local school which had recently established a special education program. See id. at 867 ("the operative placement actually functioning at the time the dispute between the Drinkers and [the school district] arose (the IEP actually functioning when the stay put provision of the IDEA was invoked) was [this child's] placement at Gladwyne Elementary"). At the time of the attempted transfer, the child's placement was

implemented at Gladwyne, and "there was no other valid IEP in place." Id. at 867.

In Thomas, the court held that in situations "where a dispute arises over a new IEP before it is implemented, but . . . a previous one is already in place. . . . the child's 'then current educational placement' will clearly be the previously implemented IEP." Thomas, 918 F.2d at 625. In Thomas, a school district developed an IEP for a child, but the school-based placement designated in that IEP was never implemented due to intervening circumstances, including difficulties arranging for transportation for the child to school and the school district's newfound ability to fund home-based instruction. In fact, no attempt was made to implement the IEP. See id. at 621-622. The PPT then issued a "revised IEP," which placed the child in a home-based program and was actually implemented for a period. During that time, the child's mother filed a due process complaint, contesting the propriety of the home-based model. In determining the child's "then-current educational placement," the court explained that "'placement' does not refer to an unimplemented IEP. . . . Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises." Id. at 625-626.

In <u>N.W. ex rel. J.W. v. Boone Cnty. Bd. of Educ.</u>, 763 F.3d 611 (6th Cir. 2014), the court explained that the language in <u>Thomas</u> referring to the "operative placement actually functioning at the time the dispute first arises" should not be read to justify requiring a school district to fund a program unilaterally chosen by a child's parents. <u>N.W.</u>, 763 F.3d at 617-18. Rather, the stay-put provision "requires the school district to approve of the educational setting at some point." <u>Id.</u> at 617. Because "[t]he District never agreed to N.W. attending [the parent's preferred school] in an IEP," that school "does not qualify as N.W.'s 'current educational placement.'" <u>Id.</u>

Thus, although <u>Mackey</u> does not use identical language in describing the interpretations of the term "then-current educational placement" in <u>Johnson</u>, <u>Drinker</u>, and <u>Thomas</u>, respectively, in each case the "then-current educational placement" was the educational placement that had been last agreed upon and implemented by the state or local educational agency and the parents. Consequently, in <u>Mackey</u> the court held that because "[t]he regulations provide that a child's current placement may be changed upon agreement between the parents and the state, and that a [state review officer] decision that 'agrees with the parents that a change of placement is appropriate . . . must be treated as such an agreement,'" the placement determined to be appropriate by the state review

officer was deemed to be the "then-current educational placement." 386 F.3d at 163 (citation omitted). See 34 C.F.R. §§ 300.518(a), (d).

This interpretation of the term "then-current educational placement" was reiterated in de Paulino, where the court explained that "implicit in the concept of 'educational placement' in the stay-put provision (i.e., a pendency placement) is the idea that the parents and the school district must agree either expressly or as impliedly by law to a child's educational program." 959 F.3d at 532. The court explained further that § 1415(j) requires "a school district 'to continue funding whatever educational placement was last agreed upon for the child until the relevant administrative and judicial proceedings are complete." Id. at 531 (quoting T.M., 752 F.3d at 171).

Here, the plaintiffs contend that C.M.'s then-current educational placement for purposes of § 1415(j) is the current home-based program. However, the record clearly establishes that C.M.'s then-current educational placement for purposes of § 1415(j) is Aspire, or a comparable therapeutic day program, such as Hubbard. See T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 419 (2d Cir. 2009) (quoting Concerned Parents v. N.Y. City Bd. of Educ., 629 F.2d 751, 756 (2d Cir. 1980) ("the term 'educational placement' in the regulations 'refers only to the

general type of educational program in which the child is
placed,'" but not "the 'bricks and mortar' of [a] specific
school"). See also Johnson, 287 F.3d at 1181-82 (denying
parents' motion for equitable relief under the stay-put
provision where the school district met that provision's
"requirements . . . by providing comparable educational
placement" to the child at a different school). A therapeutic
day program such as Aspire was the last agreed upon educational
placement, and no subsequent agreement has been implied by law.
See Pl. Ex. 17 at 1 (documentation of September 2022 PPT meeting
and IEP development discussing agreed upon plan to transition
C.M. to Aspire); Pl. Ex. 2 at 1 (documentation of June 2023 PPT
meeting confirming the PPT then considered C.M. to be enrolled
in Aspire); testimony of Ms. Tracy Edwards (the Board was not
confident that the care provided to C.M. by the two
behaviorists, who were not certified as special education
instructors, met the Board's statutory obligations to ensure
that any placement will foster a child's educational growth and
development); and testimony of Dr. Solandy Forte (the Board's
retained expert concluded that the home-based program lacked
generalizable skill development and was not sufficiently
educational to constitute an appropriate basis for an IEP).

Therefore, the plaintiffs' motion for injunctive relief
based on Count One is being denied.

B. **Count Two: Section 1415(i)**

The plaintiffs claim that the court may "determine a student's placement during the pendency of a due process administrative and judicial hearing pursuant to the equitable authority provided in 20 U.S.C. Section 1415(i)(2)(C)(iii)." Am. Compl. ¶ 56. In support of their position, the plaintiffs rely on certain language in de Paulino, 959 F.3d 519, as well as L.G. v. New York City Dep't of Educ., No. 1:23-cv-9268 (JPO), ECF No. 19 (S.D.N.Y. Nov. 3, 2023)(citing A.H. v. New York City Dep't of Educ., No. 1:22-cv-9861 (LGS), ECF No. 20 (S.D.N.Y. Nov. 23, 2022)).

In de Paulino, the court stated:

> We do not consider here, much less resolve, any question presented where the school providing the child's pendency services is no longer available and the school district either refuses or fails to provide pendency services to the child. Those circumstances are not present here. We note, however, that at least one of our sister Circuits has acknowledged that, under certain extraordinary circumstances not presented here, a parent may seek injunctive relief to modify a student's placement pursuant to the equitable authority provided in 20 U.S.C. § 1415(i)(2)(B)(iii). See Wagner v. Bd. of Educ. of Montgomery Cty., 335 F.3d 297, 302-03 (4th Cir. 2003) (involving a situation in which the pendency placement was no longer available, and the school district had failed to propose an alternative, equivalent placement).

959 F.3d at 534 n.65. In L.G., the court concluded that such "extraordinary" circumstances existed where "[n]one of the . . . schools that would have served as [the child's] pendency placement [were] available, and the school district [] failed to

-19-

propose an alternative, equivalent placement." L.G., No. 1:23-cv-9268 (JPO), ECF No. 19 at 7-8. Based on these facts, the court granted the plaintiff equitable relief pursuant to 20 U.S.C. § 1415(i). See id. at 9.

Here, the Amended Complaint does not allege facts that could show either that "the school district [has] refuse[d] or fail[ed] to provide pendency services to the child," or that the placement being offered to provide C.M.'s "pendency services is no longer available." de Paulino, 959 F.3d at 534 n.65. In fact, the Amended Complaint establishes that the Board has offered pendency services to C.M., but the parents have rejected that offer. See Am. Compl. ¶ 41 ("The school based PPT members recommended placement at Hubbard Day School ('Hubbard'), a private State approved therapeutic day school, for the 2024-2025 school year"); id. ¶ 43 ("The parents firmly disagreed that Hubbard was an appropriate placement for C.M.").[1]

Therefore, the defendant's motion to dismiss is being granted with respect to Count Two.

**IV.   CONCLUSION**

For the reasons set forth above, the defendant's Motion to Dismiss the Amended Complaint (ECF No. 45) is denied as to Count

---

[1] The court notes that the record establishes that Hubbard is still available for implementation of the last agreed upon placement.

One and granted as to Count Two, and the plaintiffs' Motion for

a Preliminary Injunction (ECF No. 5) is denied as to Count One.

The Temporary Restraining Order (ECF No. 19) is hereby VACATED.

The Clerk shall enter judgment in favor of the defendant

and close this case.

It is so ordered.

Dated this 9th day of October 2024, at Hartford,

Connecticut.


_____/s/ AWT_____
                Alvin W. Thompson
                United States District Judge